IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| Nicanor E. Casumpang, | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
|     vs. | )   Civil No. 12-00694 ACK-BMK |
| | ) |
| Hawaiian Commercial and Sugar | ) |
| Co., Paul Pacubas, and John | ) |
| Does 1 to 10, | ) |
| | ) |
|        Defendants. | ) |
| | ) |
| | ) |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### PROCEDURAL BACKGROUND

On December 21, 2012, Plaintiff Nicanor Casumpang ("Plaintiff") filed a Complaint against Defendants Hawaiian Commercial and Sugar Company ("HC&S") and Paul Pacubas. (Doc. No. 1.) On July 22, 2013, Plaintiff filed the operative First Amended Complaint ("FAC"), amending the factual allegations and adding the International Longshore and Warehouse Union, Local 142 ("ILWU") as a named defendant. (Doc. No. 25.) The FAC alleges, inter alia, the following claims: (1) HC&S violated the Labor Management Reporting and Disclosure Act by terminating Plaintiff's employment in retaliation for free speech activities related to his union membership; (2) HC&S violated H.R.S. §§ 378-2 and 378-62 by terminating Plaintiff's employment in retaliation

for his reports of unlawful practices; and (3) ILWU intentionally and deliberately failed to provide Plaintiff fair representation in retaliation for Plaintiff's exercise of his free speech rights as a union member. (FAC ¶¶ 59-61.)

On September 12, 2013, Defendant ILWU filed a Motion to Dismiss or for Summary Judgment, which the Court treated as a motion for summary judgment. (Doc. Nos. 35 & 55.) On November 25, 2013, the Court issued an order granting Defendant ILWU's motion for summary judgment as to the claims in Plaintiff's FAC against the ILWU. (Doc. No. 57.)

On February 4, 2014, Defendants HC&S and Pacubas filed the instant Motion for Summary Judgment ("Motion" or "Defs.'s Mot."), along with a concise statement of facts. (Doc. Nos. 65-66.) On July 18, 2014, Plaintiff filed an Opposition ("Opposition" or "Pl.'s Opp."), along with a concise statement of facts. (Doc. Nos. 74-75.) On July 28, 2014, Defendants filed a Reply ("Reply" or "Defs.'s Reply"). (Doc. No. 78.)

The hearing for Defendants' Motion was originally set for March 31, 2014, but was eventually moved to August 12, 2014 ("August 12 Hearing"), after the Court granted Plaintiff's multiple requests for continuances. (See Doc. Nos. 67-70, 79 & 81.)

## FACTUAL BACKGROUND

### A. Plaintiff Begins Employment at HC&S

HC&S is a sugarcane plantation and factory located in Puunene, Hawaii. (Luuwai Decl. ¶ 2.) Plaintiff began working at HC&S on July 22, 1981. (Pl.'s Decl. ¶ 1.) Plaintiff joined HC&S's electrician apprentice program in 1987 and completed the program in 1990. (Id. ¶ 2.) Plaintiff received his State of Hawaii Electrical Journeyman "EJ-6571" License, Electrical Journeyman Industrial "EJI-6447" License, and Electrical Contractor "C-13" License in July 1991, November 1991, and February 1993, respectively. (Id. ¶ 3.)

It appears that at some point Plaintiff took a leave of absence from HC&S pursuant to the Collective Bargaining Agreement ("CBA"). (FAC ¶ 15.) In January 1998, Plaintiff returned to his former position as "Electrician Level D" and was eventually promoted to "Electrician Level C." (Pl.'s Decl. ¶ 6.) In June 2001, Plaintiff was promoted to "Electrician Level B." (Id. ¶ 8.) In March 2009, Plaintiff was evidently promoted to "mill electric shop lead man." (Id. ¶ 9.)

### B. Plaintiff's Grievances and Complaints

#### 1. RRA11-019 Class Grievance Regarding Favoritism and Bootlegging

On April 27, 2011, HC&S Senior Vice President of the Factory Power Plant Anna Skrobecki and Vice President of Power Plant Operations Robert Luuwai met with ILWU representatives and a group of electricians including Plaintiff. (Luuwai Decl. ¶ 3; Pl.'s Decl. ¶ 11.) At the meeting, Plaintiff voiced his concerns

about, inter alia, favoritism and "bootlegging"[1/] violations. (Id.) On June 6, 2011, a class of electricians filed grievance RRA11-019, for contract violations based on favoritism and bootlegging. (Pl.'s CSF Ex. 17.) Specifically, the electricians alleged that HC&S violated the CBA by assigning less senior employees to act as leads in the Electrical Department. (Id.)

### 2. RRA11-023 Grievance Regarding Removal and Failure to Promote

Plaintiff asserts that, one week following the April 27 meeting, he was notified by three electric shop supervisors that he was being replaced as mill lead electrician by a "Level D" electrician who had recently completed his apprenticeship. (Pl.'s Opp. at 13.) Plaintiff further asserts that on June 8, 2011, mill supervisor Rudy Labuguen informed him that Luuwai did not sign his promotion to "Level A." (Id.) On June 15, 2011, Plaintiff filed grievance RRA11-023, claiming that he was unfairly denied a promotion to "Level A" and improperly removed from a lead position. (Defs.'s CSF Ex. 21.)

### 3. RRA11-024 Grievance Regarding Supervisor Abuse Over the Radio

On June 27, 2011, Plaintiff filed grievance RRA11-024, asserting that HC&S violated "House Rule" 5(b) by allowing Luuwai to engage in abusive behavior over the radio and that Luuwai

---

[1/]At the August 12 Hearing, Defendants explained that "bootlegging" occurs when an employee is not "promoted properly."

"totally disregards proper protocol when he gives instructions on the radio by passing the normal chain of command." (<u>Id.</u> Ex. 22.) In Step One of the Grievance Process, HC&S Human Resources Vice President Keith Goto proposed that he would counsel Luuwai about not being abusive when giving instructions on the radio and to follow the chain of command. (<u>Id.</u>) Evidently, Plaintiff verbally agreed to the Step One Settlement, but then later refused to sign the settlement form. (Goto Decl. ¶ 10; Defs.'s CSF Ex. 22.)

### 4. Complaint Regarding Vehicle Accident

On August 9, 2011, a moving vehicle in the automotive shop injured HC&S employee Daniel Pascua. (Pl.'s CSF Ex. 22.) Plaintiff asserts that he helped Pascua file a complaint against HC&S with the Hawaii Occupational Safety and Health Division ("HIOSH"). (Pl.'s Decl. ¶ 18.) In the complaint, dated September 7, 2011, Pascua alleged that the company failed to investigate the accident and institute "corrective measures." (Pl.'s CSF EX. 22.)

In response to Pascua's complaint, the HIOSH inspected the HC&S facility. (Skrobecki Decl. ¶ 4.) Apparently, during the HIOSH's interview with Pascua regarding the August 9, 2011 accident, Pascua requested that Plaintiff act as his interpreter. (<u>Id.</u> ¶ 7.) Defendants claim that HC&S did not have any knowledge of Plaintiff's involvement in the HIOSH process outside of Plaintiff acting as an interpreter during Pascua's interview with

the HIOSH. (Defs.'s Mot. at 6.)

### 5. Complaint Regarding Well 19 Wire

On September 15, 2011, a motor was replaced in Well 19 at the HC&S factory; however, the motor junction box was installed on the wrong side. (Luuwai Decl. ¶ 5.) HC&S installed a longer, temporary wire to reach the junction box. (Id.) Plaintiff told Luuwai that the temporary wire in Well 19 was unsafe. (Id. ¶ 6.)

Luuwai states that he explained to Plaintiff that the temporary wire was safe and that HC&S was going to install a permanent wire during the upcoming plant off-season in January 2012. (Luuwai Decl. ¶ 6.) Electrical supervisor Paul Pacubas states that he investigated the Well 19 temporary wire and concluded that it was not a safety concern. (Pacubas Decl. ¶ 4.) Plaintiff disputes Luuwai's and Pacubas's statements and attaches photographs to his concise statement of facts purporting to show the dangers associated with the Well 19 wire repair. (See Pl.'s CSF Exs. 3 & 13.)

### 6. Complaint Regarding the Broken Clip

On November 3, 2011, Skrobecki held a meeting with the electrical department to review the results of the HIOSH inspection. (Skrobecki Decl. ¶ 9.) During the meeting and in the

presence of Pacubas (Plaintiff's supervisor at the time),[2/]
Plaintiff told Skrobecki that he reported to Pacubas on October
26, 2011, that a grounding clip in the motor shop was broken,
unsafe to use, and thus needed to be replaced. (Pl.'s CSF Ex.
24.) In a November 7, 2011 letter to Skrobecki, Plaintiff
stated that Pacubas retaliated against him for his comments at
the November 3 meeting by confronting him about alterations to
his company-issued work coveralls. (Id.) As discussed infra,
Pacubas issued Plaintiff a discipline notice, accompanied by a
$310 fine, for altering his work coveralls. (Defs.'s CSF Ex. 29.)

### 7. RRA11-041 and RRA11-042 Grievances Relating to Property Damage

In October 2011, Pacubas issued a verbal warning to
Plaintiff for the alleged improper installation of a motor
bearing. (Pacubas Decl. ¶ 7.) According to Pacubas, two
millwrights from the machine shop confirmed that the motor
bearing had been installed upside down. (Id.)

On November 21, 2011, Plaintiff filed grievance RRA11-
041, claiming that HC&S made false statements about the damage to
the motor bearing. (Defs.'s CSF Ex. 23.) Plaintiff asserts that
HC&S issued him the warning because of his safety complaints
regarding the broken grounding clip and the Well 19 wire

---

[2/]Evidently, in fall 2011, Pacubas filled in as temporary
supervisor of the motor shop when permanent supervisor Ted Acpal
was away on vacation. (Pacubas Decl. ¶ 6.)

replacement. (Id.) On November 29, 2011, Plaintiff filed grievance RRA11-042, disputing the verbal warning issued to him over the motor bearing installation. (Id. Ex. 24.)

### 8. RRA11-038 and RRA11-043 Grievances Relating to Coverall Dispute

In his November 7, 2011 letter to Skrobecki, Plaintiff stated that he altered his company-issued work coveralls. (Pl.'s CSF Ex. 24.) Plaintiff further stated that after permanent motor shop supervisor Ted Acpal told him he could not return his coveralls, Plaintiff took the coveralls to an alteration shop where he had the sleeves cut off. (Id.) The parties agree that Plaintiff had previously attended a training session in 2011 where the electricians were told that the coveralls were for protective safety purposes. (Defs.'s CSF ¶ 20; Pl.'s CSF ¶ 20.) On November 18, 2011, Plaintiff filed grievance RRA11-038, claiming that HC&S allowed some employees but not others to return and replace oversized protective equipment. (Defs.'s CSF Ex. 25.)

Evidently, around November 23, 2011, Pacubas noticed Plaintiff had cut the sleeves off his coveralls. (Defs.'s Mot. at 9.) Pacubas issued Plaintiff an "Employee Discipline Notice" accompanied by a $310 fine for allegedly violating company safety rules and defacing company property. (Defs.'s CSF Ex. 29.) On November 29, 2011, Plaintiff filed grievance RRA11-043 challenging the discipline notice and fine. (Id. Ex. 26.)

-8-

**9. RRA12-001 Grievance Regarding Suspension and Termination for Alleged Harassment of Co-Workers and Sexual Harassment of Maukele**

On December 2, 2011, Plaintiff wrote a letter to HC&S Plantation Manager Rick Volner alleging, inter alia, that Acpal had slapped his head and punched his shoulders and back numerous times during the daily morning electricians' meetings. (Pl.'s CSF Ex. 26.)[3/] On December 14, 2011, HC&S Associate General Counsel Charles Loomis began interviewing employees regarding Plaintiff's allegations against Acpal. (Defs.'s CSF Ex. 5.)

On December 21, 2011, five electricians reported to Human Resources Director Corey Moriyama that Plaintiff had approached them in the electricians' lunchroom and demanded that they sign prepared written statements regarding Plaintiff's allegations against Acpal. (Id. Ex. 9.)[4/] The electricians told Moriyama that Plaintiff was angry and upset, pounded the table, told the electricians that he would subpoena them if they did not sign the written statements, and stated that they would be guilty of a federal offense and face five years' imprisonment if they were dishonest. (Id.) The electricians told Moriyama that they

---

[3/]Plaintiff asserts that the first incident of physical abuse by Acpal occurred on June 8, 2011. (Pl.'s Decl. ¶ 14.) However, Plaintiff did not tell HC&S higher management about the alleged abuse "prior to his letter to Rick Volner." (Defs.'s CSF Ex. 5 at DD 00218.)

[4/]Two HC&S employees signed these prepared statements. (Pl.'s CSF Ex. 12.)

felt threatened and intimidated by Plaintiff's actions. (<u>Id.</u>)

During the investigation of the December 21, 2011 lunchroom incident, HC&S learned of allegations of sexual harassment by Plaintiff towards a female co-worker, May Lynn Maukele. (<u>Id.</u> Ex. 7.) Moriyama and Loomis investigated Maukele's claim by interviewing Plaintiff, Maukele, and several other HC&S employees. (<u>Id.</u> Exs. 5-8.)

In interviews with Moriyama and Loomis, Maukele stated that Plaintiff had sexually harassed her for approximately two months. (<u>Id.</u> Ex. 6 at DD 00224-26.) According to Maukele, Plaintiff made sexual references to his body parts, commented about her breasts and other private body parts, engaged in numerous instances of sexual innuendo, brushed up against her or moved uncomfortably close to her, commented graphically about sexual acts that they could perform together, and repeatedly asked her out on dates. (<u>Id.</u>; Ex. 7 at DD 00242-43, 00255-58.)

Maukele's accounts of the alleged sexual harassment were corroborated by Chris Andrion, a HC&S electrician who worked in the motor shop with Plaintiff and Maukele. (<u>Id.</u> Ex. 6 at DD 00226-30; Ex. 7 at DD 00244-46, 00255-57.) Andrion stated during his interviews with Moriyama and Loomis that Plaintiff commented on Maukele's and Plaintiff's bodies in a sexual manner, offered to perform sex acts with her, attempted to touch her and give her back rubs, and "talked dirty to her." (<u>Id.</u>)

-10-

HC&S employees Zenaida Andaya and Fred Kuhia stated during their interviews that Maukele was extremely upset and afraid after she had interactions with Plaintiff. (Id. Ex. 7 at DD 00249-50 & DD 00253-54.) HC&S employee Esther Manibog stated during her interview that Maukele told her about several instances where Plaintiff sexually harassed her. (Id. Ex. 8 at DD 00264-66.)

During his interview with Loomis, Plaintiff "denied doing anything that constituted sexual harassment." (Id. Ex. 5 at DD 00220-22.) Plaintiff stated that he never asked Maukele out on dates, made sexual jokes or references, or attempted to touch her. Id. Benito Bolante, a HC&S employee who worked in the motor shop during the relevant time period, refuted many of Maukele's specific allegations. (Id. Ex. 6 at DD 00230-32.) However, Bolante stated that he heard Plaintiff comment about Maukele's breasts and buttocks and that he once heard Plaintiff ask Maukele on a date. (Id.)

On January 5, 2012, HC&S suspended Plaintiff while it performed additional investigations into the December 21, 2011 lunchroom incident and Plaintiff's alleged harassment of Maukele. (Pl.'s CSF Ex. 28.) On January 6, 2012, Plaintiff filed grievance RRA12-001 regarding his suspension. (Id. Ex. 27.) On January 18, 2012, after HC&S completed its investigations, the company terminated Plaintiff's employment retroactive to January 5, 2012.

(Id. Ex. 28.)

Grievance RRA12-001 was processed to Steps Two and Three, which were both denied by HC&S. (Defs.'s CSF ¶ 41; Pl.'s CSF ¶ 41.) Subsequently, the ILWU referred grievance RRA12-001 to union attorney Brad Russell to review the evidence and provide a written opinion on whether to arbitrate. (Russell Decl. Ex. 18.) On April 30, 2012, Russell issued a 21-page memorandum recommending that the ILWU should not arbitrate grievance RRA12-001. (Id.) On May 7, 2012, the ILWU issued a Notice of Decision Not to Arbitrate Grievance. (Murata Decl. Ex. 19.)[5] On May 11, 2012, Plaintiff appealed the union's decision via letter to Furtado. (Id. Ex. 22.) On July 3, 2012, ILWU International VP (Hawaii) Wesley Furtado denied Plaintiff's appeal. (Id. Ex. 27.)

Meanwhile, on January 19, 2012, Maukele obtained an ex parte temporary restraining order against Plaintiff in the Second Circuit Court of the State of Hawaii. (Defs.'s CSF Ex. 13.) After holding a hearing and evaluating Maukele's and Plaintiff's testimony, the circuit court judge issued a three-year injunction against Plaintiff beginning on January 30, 2012. (Id. Exs. 14-15.)

---

[5] The ILWU had originally issued a Notice of Intent to Arbitrate Grievance on January 27, 2012. (Pl.'s CSF Ex. 29.) However, it appears that this was submitted by the ILWU to preserve the time limits under the CBA while the union reviewed the merits of proceeding to arbitration. (See Murata Decl. at 5.)

### C. NLRB Proceedings

On July 26, 2011, the ILWU filed an Unfair Labor
Practice ("ULP") charge with the National Labor Relations Board
("NLRB") on Plaintiff's behalf. (Pl.'s CSF Ex. 21.) That charge
alleged that HC&S violated section 7 of the National Labor
Relations Act by committing several retaliatory acts in response
to Plaintiff's comments at the April 27, 2011 electricians'
meeting. (Id. Ex. 20.)

On March 23, 2012, Plaintiff filed an additional Unfair
Labor Practice charge with the NLRB, alleging that HC&S violated
section 7 of the NLRA by terminating Plaintiff's employment.
(Defs.'s CSF EX. 16.) On May 30, 2012, the Regional Director of
the NLRB dismissed Plaintiff's ULP charge. (Id. Ex. 18.) The NLRB
Office of Appeals denied Plaintiff's appeal on July 13, 2012.
(Id. Ex. 19.)

As noted earlier, Plaintiff filed his original
complaint in this action on December 21, 2012.

On June 28, 2013, the NLRB withdrew the July 26, 2011
ULP charge at Plaintiff's request. See Decision and Order of the
National Labor Relations Board, Case No. 37-CA-008339, available
at http://nlrb.gov/case/37-CA-008339.

### D. Unemployment Benefits Proceedings

At some point in time, Plaintiff filed an unemployment
benefits claim, which was denied by the State of Hawaii

Department of Labor and Industrial Relations ("DLIR") on the
basis that Plaintiff was discharged for misconduct. (Pl.'s CSF
Ex. 1.) Subsequently, Appeals Officer Laura Hirayama reversed the
DLIR's ruling and allowed the payment of benefits because HC&S
failed to meet its burden of establishing that Plaintiff was
discharged for "misconduct," as required by H.R.S. § 383-30(2).
(<u>Id.</u>)

**STANDARD**

Under Federal Rule of Civil Procedure ("Rule") 56, a
party may move for summary judgment on any claim or defense, or
part of a claim or defense. Summary judgment "should be granted
'if the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law.'" <u>Maxwell v. Cnty. of San Diego</u>, 697 F.3d 941, 947 (9th
Cir. 2012) (quoting F.R.C.P. 56(a)). Under Rule 56, a "party
asserting that a fact cannot be or is genuinely disputed must
support the assertion," either by "citing to particular parts of
materials in the record" or by "showing that the materials cited
do not establish the absence or presence of a genuine dispute, or
that an adverse party cannot produce admissible evidence to
support the fact." F.R.C.P. 56(c)(1).

The substantive law determines which facts are
material; "[o]nly disputes over facts that might affect the
outcome of the suit under the governing law will properly

-14-

preclude the entry of summary judgment." <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "The mere existence of

<u>some</u> alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the

requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."

<u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (emphasis in original).

A genuine issue of material fact exists if "a

reasonable jury could return a verdict for the nonmoving party."

<u>United States v. Arango</u>, 670 F.3d 988, 992 (9th Cir. 2012)

(quoting <u>Anderson</u>, 477 U.S. at 247). Conversely, "[w]here the

record taken as a whole could not lead a rational trier of fact

to find for the nonmoving party, there is no genuine issue for

trial." <u>Scott</u>, 550 U.S. at 380.

The moving party has the burden of persuading the court

as to the absence of a genuine issue of material fact. <u>Avalos v.</u>

<u>Baca</u>, 596 F.3d 583, 587 (9th Cir. 2010).[6] If the moving party

satisfies its burden, the nonmoving party "must do more than

simply show that there is some metaphysical doubt as to the

material facts." <u>Sluimer v. Verity, Inc.</u>, 606 F.3d 584, 587 (9th

---

[6]When the party moving for summary judgment would bear the
burden of proof at trial, the movant must present evidence which
would entitle it to a directed verdict if the evidence were to go
uncontroverted at trial. <u>Miller v. Glenn Miller Prods.</u>, 454 F.3d
975, 987 (9th Cir. 2006) (citation omitted). In contrast, when
the nonmoving party would bear the burden of proof at trial, the
party moving for summary judgment may meet its burden by pointing
out the absence of evidence from the nonmoving party. <u>Id.</u>
(citation omitted).

Cir. 2010). The nonmoving party must present evidence of a "genuine issue for trial," F.R.C.P. 56(e), that is "significantly probative or more than merely colorable." <u>LVRC Holdings LLC v. Brekka</u>, 581 F.3d 1127, 1137 (9th Cir. 2009) (citation omitted). Summary judgment will be granted against a party who fails to demonstrate facts sufficient to establish "an element essential to that party's case and on which that party will bear the burden of proof at trial." <u>Parth v. Pomona Valley Hosp. Med. Ctr.</u>, 630 F.3d 794, 798-99 (9th Cir. 2010) (citation omitted).

When evaluating a motion for summary judgment, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007). The court may not, however, weigh conflicting evidence or assess credibility. <u>In re Barboza</u>, 545 F.3d 702, 707 (9th Cir. 2008).[7] Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. <u>Anderson</u>, 477 U.S. at

---

[7]Nonetheless, a "conclusory, self-serving affidavit" that lacks detailed facts and supporting evidence may not create a genuine issue of material fact. <u>F.T.C. v. Neovi, Inc.</u>, 604 F.3d 1150, 1159 (9th Cir. 2010). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott</u>, 550 U.S. at 380. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." <u>Yeager v. Bowlin</u>, 693 F.3d 1076, 1080 (9th Cir. 2012).

250–51.

## **DISCUSSION**

As noted, the FAC alleges that HC&S violated 29 U.S.C.
§ 411, also known as § 101(a)(1) of the Labor Management
Reporting and Disclosure Act ("LMRDA"), H.R.S. § 378-2, and
H.R.S. § 378-62. (FAC ¶¶ 59-60.) Additionally, because the FAC
alleges that HC&S breached the CBA and that the ILWU breached its
duty of fair representation by failing to pursue Plaintiff's
grievances to arbitration, the Court concludes that the FAC is
attempting to bring hybrid § 301/fair representation claims under
the NLRA against HC&S. See DelCostello v. Int'l Broth. of
Teamsters, 462 U.S. 151, 164 (1983) ("[A hybrid § 301/fair
representation] suit, as a formal matter, comprises two causes of
action. The suit against the employer rests on § 301 [of the
NLRA], since the employee is alleging a breach of the collective
bargaining agreement. The suit against the union is for breach of
the union's duty of fair representation, which is implied under
the scheme of the [NLRA].").

At the August 12 Hearing, Plaintiff voluntarily
withdrew his LMRDA, H.R.S. § 378-2, and hybrid § 301/fair
representation claims against HC&S. Accordingly, Plaintiff's
remaining claims are asserted under H.R.S. § 378-62, also known
as the Hawaii Whistleblower Protection Act ("HWPA").

Defendants argue that Plaintiff's HWPA claims are

-17-

preempted by the doctrine set forth in <u>San Diego Building Trades</u> <u>Council v. Garmon</u>, 359 U.S. 236 (1959). In the alternative, Defendants argue that Plaintiff's HWPA claims fail on the merits. The Court will address Defendants' arguments in turn.

**I.        Whether Plaintiff's HWPA Claims Are Preempted by <u>Garmon</u>**

Section 7 of the NLRA, 29 U.S.C. § 157, protects employees' right "to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), states that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" section 7 of the NLRA. The Supreme Court ruled in <u>Garmon</u> that, "[w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board[.]" <u>Garmon</u>, 359 U.S. at 245. <u>Garmon</u> preemption thus divests both state and federal courts of jurisdiction to hear a preempted claim, as only the NLRB may address the dispute. <u>Id.</u>

Here, there is no suggestion that Plaintiff engaged in self-organization, forming, joining, or assisting labor organizations, or collective bargaining. Thus, Plaintiff's

actions may only fall under section 7 if he engaged in "other
concerted activities for the purpose of . . . other mutual aid or
protection."

The critical inquiry in examining whether an activity
is "concerted" within the meaning of section 7 of the NLRA is
whether the employee acted "with or on behalf of other employees,
and not solely by and on behalf of the . . . employee himself."
NLRB v. Yurosek, 53 F.3d 261, 264 (9th Cir. 1995). Additionally,
the activity must be "protected," that is, an action that "'can
reasonably be seen as affecting the terms and conditions of
employment.'" Id. at 266 (quoting Gatliff Coal Co. v. NLRB, 953
F.2d 247, 251 (6th Cir. 1992)). As to the "mutual aid or
protection clause" in § 7, this clause "protects employees from
retaliation by their employers when they seek to improve working
conditions through resort to administrative and judicial
forums[.]" Eastex v. N.L.R.B., 437 U.S. 556, 566 (1978).

In Sears, Roebuck and Co. v. San Diego Dist. Council,
the Supreme Court stated that it "has refused to apply the Garmon
guidelines in a literal, mechanical fashion" because "'the
decision to preempt . . . state court jurisdiction over a given
class of cases must depend upon the nature of the particular
interests being asserted and the effect upon the administration
of national labor policies' of permitting the state court to
proceed." 436 U.S. 180, 188-89 (1978) (quoting Vaca v. Sipes, 386

-19-

U.S. 171, 180)). Recognizing that the rationale behind

Garmon preemption is the NLRB's "primary jurisdiction" over labor

disputes, the Sears Court held that

> [t]he critical inquiry, therefore, is not
> whether the State is enforcing a law relating
> specifically to labor relations or one of
> general application but whether the
> controversy presented to the state court is
> identical to . . . or different from . . .
> that which could have been, but was not,
> presented to the Labor Board. For it is only
> in the former situation that a state court's
> exercise of jurisdiction necessarily involves
> a risk of interference with the unfair labor
> practice jurisdiction of the Board which the
> arguably prohibited branch of the Garmon
> doctrine was designed to avoid.

Id. at 197.

Moreover, even if an activity is arguably subject to

sections 7 or 8 of the NLRA, certain exceptions to Garmon apply:

state activity will not be preempted if it is "a merely

peripheral concern" of the NLRA, or if it "touche[s] interests so

deeply rooted in local feeling and responsibility that, in the

absence of compelling congressional direction, [a court] cannot

infer that Congress had deprived the States of the power to act."

Garmon, 359 U.S. at 243-44.

In this case, Plaintiff's HWPA claims fall into three

categories for analytical purposes: (1) claims relating to his

suspension and termination; (2) claims based on his complaints at

the April 27, 2011 meeting; and (3) claims based on his October

2011 and November 2011 reports regarding the broken grounding

clip.

First, Plaintiff asserts that he was suspended and terminated in retaliation for making numerous complaints and grievances from April 2011 to December 2011. (See generally Pl.'s Decl.) These complaints and grievances concerned alleged safety violations, favoritism, bootlegging, physical abuse, harassment, unfair treatment, and hostile working conditions. (Id.)

Second, at the April 27, 2011 electricians' meeting, Plaintiff complained about alleged safety violations, favoritism, and bootlegging. Plaintiff asserts that in response to his complaints at the April 27 meeting (1) Acpal slapped him on the back of his head on June 8, 2011; (2) Luuwai notified him that he did not sign his promotion to "Level A" on June 8, 2011; (3) HC&S removed him as "mill lead electrician" and replaced him with a "Level D" electrician who recently completed his apprenticeship[8] on June 13, 2011; and (4) HC&S transferred him to the motor shop on June 13, 2011. (See Pl.'s Decl. ¶¶ 14-15.)

Finally, Plaintiff asserts that Pacubas issued him a verbal warning in late October 2011 regarding the alleged improper installation of a motor bearing after he reported to

---

[8]Plaintiff states in his declaration and Opposition brief that he was replaced by a Level D electrician who recently completed his apprenticeship. (Pl.'s Decl. ¶ 15; Pl.'s Opp. at 13.) However, HC&S produces evidence indicating that Plaintiff was replaced by Donnie Tablang, a Level B Electrician. (Defs.'s CSF Ex. 21 at DD 00018.)

Pacubas on October 26, 2011, that a grounding clip in the motor shop was broken and unsafe to use. Plaintiff further asserts that, after he told Skrobecki at the November 3, 2011 electrical department meeting that Pacubas failed to address his safety concerns about the broken grounding clip, Pacubas issued him an Employee Discipline Notice and a $310 fine for altering his work coveralls.

The Court now turns to whether these three categories of HWPA claims are preempted by <u>Garmon</u>. The Court notes that Plaintiff filed grievances regarding each one of these HWPA claims.

### A. HWPA Claims Regarding Suspension and Termination

First, as to Plaintiff's HWPA claims that he was suspended and terminated in retaliation for his complaints and grievances about alleged safety violations, favoritism, and bootlegging, the Court finds that these claims are preempted by <u>Garmon</u>.[9/]

---

[9/]Plaintiff also asserts that he was suspended and terminated in retaliation for reporting to Volner that Acpal slapped his head and punched his shoulders and back numerous times during daily morning electricians' meetings. (Pl.'s Opp. at 14.) It appears that this claim does not involve protected concerted activity within the meaning of section 7 of the NLRA because Plaintiff was acting solely on behalf of himself, and not on behalf of other HC&S employees, when he made this report. <u>See</u> <u>Mike Yurosek</u>, 53 F.3d at 264. Accordingly, it appears that this claim is not preempted by <u>Garmon</u>.

Further, Plaintiff appears to assert that he was suspended
(continued...)

It appears that Plaintiff was acting "on behalf of other employees" and seeking to improve "working conditions" within the meaning of section 7 of the NLRA when he made complaints and filed grievances regarding alleged safety violations, favoritism, and bootlegging. Plaintiff states in his declaration that he first brought up these issues at the April 27 electricians' meeting attended by HC&S Vice Presidents Skrobecki and Luuwai, ILWU representatives, and the electricians. (Pl.'s Decl. ¶ 11.) Plaintiff states that he was "very vocal" during the meeting, "sensing" that the other electricians were "hesitant to speak[,] fearful of retaliation." Id. Moreover, Plaintiff was among a group of electricians who filed class grievance RRA11-0119, alleging that HC&S breached the CBA by engaging in bootlegging and favoritism. (Defs.'s CSF Ex. 20.)

The Court also observes that claims of favoritism and safety violations are typical issues of dispute under the NLRA. See, e.g., NLRB v. Griffin, 243 Fed. App'x 771, 775 (4th Cir. 2007) (finding that complaints about favoritism "involve the type

---

[9/](...continued)
and terminated in retaliation for filing a grievance regarding his removal as mill lead electrician, transfer to the motor shop, and failure to be promoted to "Level A." As discussed in Part I.B. of this Order infra, Plaintiff contends that his "removal," "transfer," and "lack of promotion" were retaliatory acts committed by HC&S in response to his comments at the April 27 electricians' meeting. Because sections 7 and 8 of the NLRA prohibit employers from retaliating against employees for engaging in protected concerted activity, these claims are preempted by Garmon.

of workplace issues that § 7 enables employees to address"); and
Platt v. Jack Cooper Tranp., 959 F.2d 91, 94 (8th Cir. 1992)
("Thus, Platt's claim that he was discharged in retaliation for
making safety complaints satisfies the threshold test for
Garmon preemption."). Additionally, the Court notes that sections
7 and 8 of the NLRA specifically prohibit HC&S from retaliating
against Plaintiff for engaging in protected concerted activity.
Eastex, 437 U.S. at 566; Henry v. Laborers' Local 1191, 495 Mich.
260, 290 (Mich. 2014).

In determining whether the Garmon doctrine should
apply, the Court finds it "highly relevant that [Plaintiff]
unsuccessfully sought relief through the grievance process, and
directly from the NLRB, before commencing this lawsuit. Platt,
959 F.2d at 95. Plaintiff has filed several claims through the
grievance process provided for in the CBA, asserting that HC&S
failed to remedy unsafe work conditions and engaged in favoritism
and bootlegging. (See, e.g., Defs.'s CSF Ex. 23 (grievance RRA11-
041 involving safety complaints about the broken grounding clip
and Well 19 wire replacement); Pl.'s CSF Ex. 17 (class grievance
RRA11-017 regarding favoritism and bootlegging violations.)

With respect to the NLRB proceedings, Plaintiff's ULP
charge alleged that HC&S "interfered with" and "restrained"
Plaintiff "in the exercise of [his] rights as guaranteed in
Section 7 of the [NLRA] by terminating" his employment. (Defs.'s

CSF Ex. 16.) Specifically, Plaintiff claimed that he was "suspended and terminated in retaliation for having complained about workplace terms and conditions of employment, specifically safety related issues as well as for complaining about favoritism[.]"[10/] (Id. Ex. 18 at DD 00110.) In rejecting Plaintiff's claims, the Regional Director of the NLRB found that

> the evidence unquestionably supports the
> Employer's position that it had legitimate
> business reasons to suspend and then
> terminate [Plaintiff's] employment.
> Specifically, threatening [Plaintiff's] co-
> workers and sexually harassing another. It is
> clear that the Employer would have taken the
> same action irrespective of whether
> [Plaintiff] engaged in union and/or protected
> concerted activity. Thus, in these
> circumstances, I cannot conclude that the
> Employer violated the [National Labor
> Relations Act] as alleged.

(Id. at DD 00111.)

Because the Regional Director of the NLRB has already issued a decision (later affirmed by the NLRB Office of Appeals) dismissing Plaintiff's ULP charge against HC&S based on the same unsafe working conditions and favoritism concerns, "'[t]he risk of interference with the Board's jurisdiction is . . . obvious and substantial' when an unsuccessful charge to the Board is recast as a state law claim." Platt, 959 F.2d at 95 (quoting

---

[10/]It appears that Plaintiff also alleged in his March 23, 2012 ULP charge that he was terminated in retaliation for reporting that Acpal slapped and punched him during daily morning electricians' meetings. (See Defs.'s CSF Ex. 18 at DD 00110.)

Local 926, IUOE v. Jones, 460 U.S. 669, 683 (1983)). As the

Eighth Circuit stated in Platt, "the [Garmon preemption]

rationale has the greatest validity when a party has sought

redress for his claims from the NLRB and in the face of an

adverse decision the claims are restructured as state law

claims[.]" Id.

Accordingly, this Court concludes that Plaintiff's HWPA

claims that he was suspended and terminated in retaliation for

his complaints and grievances about alleged safety violations,

favoritism, and bootlegging involve conduct that is "arguably

protected" by sections 7 and 8 of the NLRA. Furthermore, as

discussed in footnote nine of this Order supra, Plaintiff's HWPA

retaliation claims regarding his removal as mill lead

electrician, transfer to the motor shop, and failure to be

promoted to "Level A" also involve conduct that is arguably

protected by sections 7 and 8 of the NLRA. As such, these claims

are preempted unless one of the exceptions to Garmon applies.

Regarding the first exception to Garmon, that for

"merely peripheral" concerns, safety violations, favoritism and

bootlegging issues are of central, not peripheral, concern to the

NLRA's purposes in protecting the right of employees to organize

to improve their working conditions. Henry, 495 Mich. at 290.

"Relatedly, because this protection has been central to the

NLRA's purposes for nearly 80 years, the more recent attempt of

[the HWPA] to regulate retaliation for an alleged unfair labor practice does not 'touch interests so deeply rooted in local feeling and responsibility' that the Court could not infer that Congress intended the NLRB to have exclusive jurisdiction over [HWPA claims] arising out of complaints regarding" safety violations, favoritism and bootlegging. <u>Id.</u>

Plaintiff argues that <u>Garmon</u> preemption should not be applied in this case because of the Ninth Circuit's decision in <u>Paige v. Henry J. Kaiser Co.</u>, 826 F.2d 857, 864 (9th Cir. 1987). <u>Paige</u> has been summarized as follows:

> [In <u>Paige</u>], the plaintiffs filed a complaint in state court, alleging among other things, they had been terminated after they refused to refuel a generator because of concerns about the safety of the procedure, about which they had complained. The defendants removed the case to federal court, arguing that the wrongful discharge claims were artfully pleaded claims under the LMRA and were preempted. The court first considered the rules for removal jurisdiction on the basis of preemption, as described by the Supreme Court in <u>Caterpillar, Inc. v. Williams</u>, 482 U.S. 386 (1987), a case decided under the LMRA. It noted that the district court had concluded that the wrongful termination claim was an artfully pleaded claim, which was preempted by the LMRA, and dismissed it as time-barred. [<u>Paige</u>, 826 F.2d at 860, 862]. The Ninth Circuit reversed. In a single paragraph, with no analysis, the panel observed that the employees' claim was based on Cal/OSHA provisions requiring employers to provide a safe place of employment and prohibiting the discharge of employees who complain about unsafe working conditions; it also rejected the employer's claim that this was protected concerted

activity, and said that the plaintiffs, as
masters of their complaint, could choose to
plead only a state law claim, again citing to
Caterpillar. Id. It concluded that "Garmon
analysis is therefore not relevant to this
case." Id.

Mayes v. Kaiser Foundation Hospitals, 917 F.Supp.2d 1074, 1084-85

(E.D. Cal. 2013).

This Court agrees with the Mayes court that Paige has a

questionable "precedential effect" and is more concerned about

"removal jurisdiction than Garmon preemption." Id. Further, and

importantly, Paige is readily distinguishable from the instant

case because the plaintiff in Paige had not sought relief through

the grievance process or directly from the NLRB before filing his

retaliatory termination claims in state court.[11/] Again, the

critical inquiry for Garmon preemption purposes is "whether the

controversy presented to the state court is identical to . . .

that which could have been, but was not, presented to the Labor

Board." Sears, Roebuck, 436 U.S. at 197. As discussed in detail

above, Plaintiff's HWPA claims that he was suspended and

terminated in retaliation for his complaints and grievances about

alleged safety violations, favoritism, and bootlegging are

identical to those claims Plaintiff brought before the NLRB.

_____

[11/]Inter-Modal Rail Employees Assn. v. Burlington Northern &
Santa Fe Ry. Co., 73 Cal. App. 4th 918 (Cal. App. 1999), upon
which Plaintiff relies, is also distinguishable for this reason.
The plaintiffs in Inter-Modal did not file any grievances or a
NLRB charge before filing their complaint in California state
court. Id.

For these reasons, the Court concludes that Plaintiff's HWPA claims that he was suspended and terminated in retaliation for his complaints and grievances about alleged safety violations, favoritism, and bootlegging are preempted by <u>Garmon</u>. Moreover, as discussed in footnote nine of this Order <u>supra</u>, Plaintiff's HWPA retaliation claims regarding his removal as mill lead electrician, transfer to the motor shop, and failure to be promoted to "Level A" are preempted by <u>Garmon</u>. Thus, the Court lacks jurisdiction to hear these claims.

### B. HWPA Claims Based on Complaints Raised at the April 27, 2011 Electricians' Meeting

With respect to Plaintiff's HWPA claims premised on his complaints at the April 27 electricians' meeting, the Court finds that they are likewise preempted.

As noted above, during the April 27 meeting, Plaintiff complained about safety violations, favoritism, and bootlegging. The Court has already determined that these complaints were made "on behalf of other employees" and sought to improve "working conditions" within the meaning of section 7 of the NLRA. Furthermore, sections 7 and 8 of the NLRA prohibit the four retaliatory acts allegedly taken against Plaintiff by HC&S for Plaintiff's complaints at the April 27 meeting. The Court observes that the ILWU filed an Unfair Labor Practice charge on Plaintiff's behalf on July 26, 2011, regarding these claims. That charge was withdrawn at the request of Plaintiff after the NLRB

ruled against him on his ULP charge filed March 23, 2012, and after he filed his original complaint in this action. Thus, Plaintiff's claims here are again "identical to that which could have been . . . presented to the Labor Board." <u>Sears, Roebuck</u>, 436 U.S. at 197.

Because none of the exceptions to <u>Garmon</u> identified above applies, <u>see</u> <u>supra</u> pages 26–27, the Court concludes that Plaintiff's HWPA retaliation claims based on his complaints at the April 27, 2011 electricians' meeting are preempted by <u>Garmon</u> and, therefore, the Court lacks jurisdiction to hear these claims.

### C. HWPA Claims Based on Reports Regarding the Broken Grounding Clip

As to Plaintiff's HWPA claims premised on his reports regarding the broken grounding clip, it appears that Plaintiff was acting on behalf of other HC&S employees and seeking to improve an unsafe work environment when he filed these complaints. As a result, Plaintiff's conduct in making these reports is arguably protected by section 7 of the NLRA. Furthermore, as discussed above, the two retaliatory acts allegedly committed against Plaintiff by HC&S in response to his complaints about the broken grounding clip are barred by sections 7 and 8 of the NLRA. Because none of the exceptions to <u>Garmon</u> identified above applies, <u>see</u> <u>supra</u> pages 26–27, the Court finds that Plaintiff's HWPA claims based on his reports regarding the

-30-

broken grounding clip are preempted by <u>Garmon</u> and, therefore, the Court lacks jurisdiction to hear these claims.

In sum, the Court concludes that all of Plaintiff's HWPA claims are preempted under <u>Garmon</u>, except Plaintiff's claim that he was suspended and terminated in retaliation for reporting to Volner that Acpal slapped and punched him numerous times during daily morning electricians' meetings.

## II.    **Whether Plaintiff's HWPA Claims Fail on the Merits**

While the Court concludes that all but one (which is mentioned immediately hereinabove) of Plaintiff's HWPA claims are preempted, the Court will nevertheless address the merits of all of Plaintiff's claims here, as the Court concludes that, alternatively, all of Plaintiff's claims fail as a matter of law under the HWPA.

The Hawaii Whistleblower Protection Act, H.R.S. § 378-62, provides in relevant part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privilege of employment because:
>
> (1) The employee . . . reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:
>
> (A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States. . .

A HWPA claim contains the following three elements: (1) the employee engaged in protected conduct as it is defined by the HWPA; (2) the employer has taken some adverse action against the employee; and (3) there is a causal connection between the alleged retaliation and the "whistleblowing." Griffin v. JTSI, Inc., 654 F.Supp.2d 1122, 1130-31 (D. Haw. 2008) (citing Crosby v. State Dept. of Budget & Fin., 76 Haw. 332, 342 (Haw. 1994)).

This Court has previously explained that

> [t]he HWPA's legislative history indicates that the legislature intended that the required burden of proof [in showing a causal connection] be similar to that utilized in traditional labor management relations discharge cases." [Crosby, 76 Haw. at 342]. In labor management retaliation cases under the National Labor Relation Act, 29 U.S.C. §§ 151-169, the employer bears "'the burden of negating causation'" once the employee makes an initial showing of a causal connection. Id. (quoting Sonicraft, Inc. v. N.L.R.B., 905 F.2d 146, 150 (7th Cir. 1999)); see also Hse. Stand. Com. Rep. No. 25, in 1987 House Journal, at 1090 (noting "the existing custom and practice of placing the burden of proof on the employer in [labor management] discharge cases").

> Thus, the causal connection requirement under the HWPA has two stages of proving or negating the causation between the protected conduct and the employee's termination. First, the employee must make a prima facie showing "that his or her protected conduct was a 'substantial or motivating factor' in the decision to terminate the employee." [Crosby, 76 Haw. at 342]; accord Nabors Alaska Drilling, Inc. v. N.L.R.B., 190 F.3d 1008, 1015 (9th Cir. 1999). Second, once the employee makes its prima facie showing, the employer must then "'defend affirmatively by

-32-

showing that the termination would have occurred regardless of the protected activity.'" [Crosby, 76 Haw. at 342 (quoting N.L.R.B. v. Howard Elec. Co., 873 F.2d 1287, 1290 (9th Cir. 1989))]; see also N.L.R.B. v. Searle Auto Glass, Inc., 762 F.2d 769, 773 (9th Cir. 1985) ("[A]s an affirmative defense, the employer may show by a preponderance of the evidence that the employee would have been terminated even in the absence of the protected conduct."); Nabors Alaska Drilling, 190 F.3d at 1015 (holding that once the employee makes its prima facie showing, "[t]he burden then shifts to the employer to prove that legitimate reasons supported the termination").

Id. at 1131-32.

## A. HWPA Claims Regarding Suspension and Termination

As noted above, Plaintiff asserts that he was suspended and terminated in retaliation for having complained about, inter alia, alleged safety violations, favoritism, bootlegging, physical abuse, and harassment. Although the Court finds that these claims (except his claim regarding the alleged slapping and punching incidents) fall within the category of HWPA claims preempted by Garmon, see Part I.A. of this Order, supra pages 22-29, the Court will nevertheless address the merits of these claims.

Regarding these claims, HC&S does not dispute that Plaintiff was engaged in protected conduct under the HWPA. Nor is there a dispute that either the suspension or termination constitutes an adverse employment action. The Court therefore

finds, for purposes of this motion, that Plaintiff has satisfied the first and second elements of his HWPA retaliatory termination claims. Thus, the sole issue is whether there is a causal connection between the protected activity and the asserted retaliation.

As stated above, Plaintiff must make a prima facie showing that his protected conduct was a substantial or motivating factor in HC&S's decision to suspend or terminate him. Id. at 1131. "To show that an employee's protected conduct was a 'substantial or motivating factor' in the employer's decision to terminate, 'a plaintiff can introduce evidence regarding the 'proximity in time between the protected action and the allegedly retaliatory employment decision,' from which a 'jury logically could infer [that the plaintiff] was terminated in retaliation[.]'" Id. at 1132. (quoting Coszalter v. City of Salem, 320 F.3d 968, 977 (9th Cir. 2003)). "Though an employee may always present direct evidence of motive, proximity in time is one type of circumstantial evidence that is sufficient on its own to meet the plaintiff's burden." Id. at 1133.

Here, HC&S suspended Plaintiff on January 5, 2012, and terminated his employment on January 18, 2012. Plaintiff made several complaints and filed grievances relating to, inter alia, purported safety violations and harassment within a few months of the asserted retaliatory employment decisions. (See, e.g., Pl.'s

CSF Ex. 24 (reporting during the November 3, 2011 meeting with Skrobecki that a grounding clip in the motor shop was broken and unsafe to use); Defs.'s CSF Ex. 23 (filing grievance RRA11-041 on November 21, 2011, alleging false statements made about the damage to motor bearing); and Pl.'s CSF Ex. 26 (December 2, 2011 letter to Volner asserting that Acpal slapped and punched him). It therefore appears that there is sufficient temporal proximity between at least some of Plaintiff's "protected activity" and the suspension and termination sufficient to satisfy Plaintiff's prima facie showing of causation. See, e.g., Nidds v. Schindler Elevator Corp., 113 F.3d 912, 919 (9th Cir. 1996) (four-month period between protected activity and layoff sufficiently close to show "causal link"); Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (three-month period sufficient to infer causation).

Although it appears that Plaintiff has made a prima facie showing of causation based solely on temporal proximity, the Court concludes that HC&S has successfully negated any causal connection because the evidence shows that the suspension and termination "would have occurred regardless of the protected activity." Griffin, 654 F.Supp.2d at 1132. HC&S's decision to suspend and terminate Plaintiff's employment was based on legitimate business reasons, specifically, that Plaintiff sexually harassed Maukele, and intimidated and harassed other co-

workers. Thus, as stated in the NLRB decision dismissing Plaintiff's ULP charge, "[i]t is clear that [HC&S] would have taken the same action irrespective of whether [Plaintiff] engaged in . . . protected concerted activity." (Defs.'s CSF Ex. 18.)

Plaintiff attempts to create a genuine issue of material fact as to whether HC&S fabricated allegations of sexual harassment. In his declaration, Plaintiff appears to state that Chris Andrion told HC&S investigators that he did not know whether Plaintiff sexually harassed Maukele and directed them to speak directly with Plaintiff. (Pl.'s Decl. ¶ 30.) Plaintiff also states in his Opposition brief that Andrion heard Loomis pressure Maukele into "admitting" that Plaintiff sexually harassed her. (Pl.'s Opp. at 5.) Neither of these statements can create a genuine issue of material fact because they are uncorroborated and not based on Plaintiff's personal knowledge, as Plaintiff does not explain how he knows them to be true. See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (refusing to find a genuine issue of material fact "where the only evidence presented is uncorroborated and self-serving testimony"); and S.E.C. v. Phan, 500 F.3d 895, 909-10 (9th Cir. 2007) (explaining that the declaration in Villiarimo "included facts beyond the declarant's personal knowledge and provided no indication how she kn[ew] these facts to be true") (internal

quotation marks omitted).[12/]

Plaintiff's statements in his declaration and
Opposition brief also cannot create a genuine issue of material
fact because they are contradicted by the record. See Scott, 550
U.S. at 380. Specifically, the notes prepared by Moriyama and
Loomis during their interviews with HC&S employees contain
statements corroborating Maukele's sexual harassment allegations.
During his interviews with Moriyama and Loomis, Andrion stated
that Plaintiff commented on Maukele's and Plaintiff's bodies in a

_____

[12/]Likewise, Appeals Officer Hirayama's ruling does not
create a genuine issue of material fact as to whether HC&S had a
reasonable basis for finding that Plaintiff sexually harassed
Maukele. (See Pl.'s CSF Ex. 1.) This ruling "establishes only
that [HC&S] did not carry its burden before the DLIR of proving
that Plaintiff was discharged for 'misconduct' as required by
[H.R.S. § 380-30(2)] to disqualify Plaintiff from unemployment
benefits." Outlaw v. United Airlines, Inc., Civ. No. 09-00620
JMS/BMK, 2011 WL 1135165, at *7, n. 5 (D. Haw. Mar. 24, 2011).
Hawaii Administrative Rule 12-5-51 defines "misconduct" as
"actions which show a willful or wanton disregard of the
employer's interests" and excludes "[m]ere inefficiency,
unsatisfactory conduct, poor performance because of inability or
incapacity, isolated instances of ordinary negligence or
inadvertence, or good-faith errors in judgment or discretion[.]"
H.A.R. § 12-5-51(c). As shown, the standard for state
unemployment benefits claims is different than that in a HWPA
case. Accordingly, Appeals Officer Hirayama's ruling should be
afforded no weight. See Outlaw, 2011 WL 1135165, at *7 n. 5
(holding that a DLIR decision "provided Plaintiff no relief"
because the standard for entitlement to unemployment benefits is
not the same as the standard in a Title VII race discrimination
suit); and Motoyama v. Hawaii, Dep't of Transp., 864 F.Supp.2d
965, 983 n. 15 (D. Haw. 2012) (concluding that a decision by
unemployment insurance ("UI") benefits division was not
controlling in Americans With Disabilities Act suit because "the
standards for state UI benefits [are] different than that in a
federal employment discrimination case").

sexual manner, offered to perform sex acts with her, and "talked dirty to her." (Defs.'s CSF Ex. 6 at DD 00226-30; Ex. 7 at DD 00244-46, 00255-57.) Esther Manibog, Maukele's co-worker, stated during her interview that Maukele told her about several instances where Plaintiff sexually harassed her. (Id. Ex. 8 at DD 00264-66.) Even Benito Bolante (HC&S employee working in the motor shop), who initially stated that he did not witness any incidents of sexual harassment, admitted that Plaintiff commented on Maukele's breasts and buttocks and that he once heard Plaintiff ask her out on a date. (Id. Ex. 6 DD 00230-22.)

The Court observes that the notes prepared by Moriyama and Loomis during their interviews with HC&S employees about Maukele's sexual harassment allegations raise hearsay concerns. Hearsay is defined as any statement that: "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The "exclusionary rule" deems hearsay to be inadmissible unless one of the exceptions applies. At first glance, it appears that the interviews notes contain hearsay within hearsay because they consist of (1) statements by the interviewed employee in response to Moriyama's and Loomis' questions; and (2) Moriyama's and Loomis' own statements as engendered in the notes themselves, which assert that their content is an accurate reflection of what

was said during the interviews. However, the Court concludes that only the second set of statements is hearsay, while the first set is not, because the statements are not being brought to prove the truth of their contents.

As to the first set of statements, the Court finds that these statements are not being brought to establish that Plaintiff actually sexually harassed Maukele, "but rather to document that as part of its disciplinary procedures, [HC&S's] management and [its] Human Resources Department performed investigations, gathered relevant information and made determinations based on the evaluation of the information collected." Garcia v. Sprint PCS Caribe, 841 F.Supp.2d 538, 544-45 (D. P.R. 2012). The statements made by HC&S employees to Moriyama and Loomis are not hearsay because their real purpose is to establish that HC&S had a legitimate good-faith basis for suspending and terminating Plaintiff. Id. at 545; see also McCrimon v. Inner City Nursing Home, Inc., 1:10 CV 392, 2011 WL 4632865, at *9 (N.D. Ohio Sept. 30, 2011) (finding that a letter from the family of a patient at defendant-employer's nursing home alleging plaintiff abused patients in advance of her termination was not hearsay because the letter "has been offered, not as proof that Plaintiff abused a resident, but instead as evidence of [the employer's] good faith belief that Plaintiff had mistreated a resident and that Plaintiff was terminated for a

legitimate, non-discriminatory reason"). Consequently, the first set of statements are not hearsay, and this Court may consider them.

Regarding Moriyama's and Loomis' statements that the notes were an accurate reflection of what was said during the interviews, the Court concludes that these statements fall within the "records of a regularly conducted activity" hearsay exception. Fed. R. Evid. 803(6). Under this exception, the records are admissible if they: (1) were "made at or near the time by – or from information transmitted by – someone with knowledge"; (2) were "kept in the course of a regularly conducted activity of a business"; (3) "making the record was a regular practice of that activity"; (4) "all these conditions are shown by the testimony of the custodian or another qualified witness"; and (5) "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness." Id. Here, HC&S has provided a sworn statement by Loomis indicating that all of the conditions mandated by Fed. R. Evid. P. 803(6) have been met. (See generally Decl. of Loomis.) Loomis' sworn statement notes that HC&S regularly investigates allegations of employee misconduct and maintains files and records pursuant to those investigations in its normal course of business. (Id.) As a result, the Court concludes that it can consider the entirety of Moriyama's and Loomis' interviews notes.

In addition to sexual harassment, the record shows that HC&S's decision to suspend and then terminate Plaintiff was also based on the company's findings that Plaintiff intimidated and harassed co-workers. Specifically, the record indicates that five electricians reported to Moriyama that, on December 21, 2011, Plaintiff approached them in the electricians' lunchroom and demanded that they sign a prepared written statement regarding Plaintiff's allegations against Acpal. (Defs.'s CSF. Ex. 9.) The electricians reported that Plaintiff was angry and upset, pounded the table, threatened to subpoena them, and told them that they would be guilty of a federal offense and face years' imprisonment if they were not honest. (Id. Exs. 8 & 9.) The electricians told Moriyama that they felt threatened and intimidated by Plaintiff's actions. (Id.)

Moreover, Plaintiff has not produced evidence from which a reasonable jury could find that HC&S did not conduct its investigations in good faith or did not honestly believe that Plaintiff harassed a female co-worker and intimidated and threatened others. See Villiarimo, 281 F.3d at 1062-64 (finding that, in the context of a Title VII employment discrimination suit, an employer's good faith belief that termination is warranted is sufficient to form a legitimate nondiscriminatory reason for the termination). In fact, regarding the sexual harassment allegations, HC&S good-faith belief is evidenced by

the state court's holding that Maukele "has proved by clear and convincing evidence that the Court should be issuing [a three-year] injunction to prevent further acts of harassment." (Defs.'s CSF Ex. 15 at 56.)

HC&S's good-faith belief is further evidenced by ILWU attorney Brad Russell's 21-page memorandum, which recommended that the union should not arbitrate grievance RRA12-001 (regarding suspension and termination). (Russell Decl. Ex. 18.) After reviewing the evidence and interviewing Plaintiff's co-workers, Russell determined that Plaintiff's "conduct towards his co-workers in the electricians' lunchroom on 12/12/11 [was] harassment." (<u>Id.</u> at 17.) Additionally, Russell concluded that HC&S could establish by a "preponderance of the evidence" or by "clear and convincing evidence" that Plaintiff sexually harassed Maukele. (<u>Id.</u>) Due in large part to these findings, Russell recommended that the ILWU not arbitrate grievance RRA12-001 because the union would not prevail in challenging Plaintiff's termination; the ILWU adopted his recommendation and decided not to pursue Plaintiff's grievance to arbitration.

In sum, the Court concludes that Defendants have successfully negated any inference of a causal connection because HC&S had legitimate business reasons for the suspension and termination, specifically, that Plaintiff sexually harassed Maukele and threatened and intimidated other co-workers. Thus,

the Court concludes that HC&S's decision would have occurred in the absence of Plaintiff's complaints of alleged safety violations, physical abuse, and harassment. Because the causal connection element has not been satisfied, Plaintiff's HWPA retaliatory termination claims fail on the merits. Alternatively, as discussed above, this Court lacks jurisdiction to hear these claims (except his claim regarding the alleged slapping and punching incidents) because they are preempted by <u>Garmon</u>. <u>See</u> Part I.A. of this Order, <u>supra</u> pages 22-29.

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's HWPA retaliatory termination claims.[13]

### B. HWPA Claims Based on Complaints Raised at the April 27, 2011 Electricians' Meeting

As discussed above, Plaintiff asserts that, during the April 27, 2011 electricians' meeting, he complained about unsafe work conditions, favoritism, and bootlegging. (Pl.'s Decl. ¶ 11.) Plaintiff further asserts that, in response, HC&S committed the following retaliatory acts: (1) one week after the April 27 meeting, Plaintiff was removed from his position as "mill lead electrician" and replaced by a "Level D" electrician who recently

_____

[13]To the extent Plaintiff asserts HWPA claims against Pacubas, these claims fail because an individual employee cannot be held liable under H.R.S. § 378-62. <u>See</u> <u>Onodera v. Kuhio</u> <u>Motors, Inc.</u>, Civ. No. 13-000444 DKW-RLP, 2014 WL 1031039, at *7-*8 (D. Haw. Mar. 13, 2014) (dismissing HWPA claims against individual employees).

completed his apprenticeship[14]; (2) on June 8, 2011, Acpal slapped him on the back of his head; (3) also on June 8, 2011, Plaintiff was informed that Luuwai did not sign his promotion to "Level A"; and (4) on June 13, 2011, Plaintiff was reassigned to the motor shop. (Pl.'s Opp. at 13.) Although the Court finds that these claims (except his claim regarding the alleged slapping and punching incidents) are preempted by Garmon, see Part I.B. of this Order, supra pages 29-30, the Court will nevertheless address the merits of these claims.

Defendants first argue that Plaintiff did not engage in protected activity at the April 27 meeting because Luuwai and Skrobecki did not recall Plaintiff complaining about unsafe work conditions, and grievances RRA11-023 and RRA11-024 make no mention of safety complaints. (Defs.'s Reply at 13.) Even assuming arguendo that Plaintiff did not report alleged safety violations at the April 27 meeting, the Court finds that Plaintiff's complaints about favoritism and bootlegging constitute "protected activity." Accordingly, the first element under Griffin is satisfied.

Defendants also argue that Plaintiff's asserted reassignment to the motor shop was not an adverse action because Plaintiff maintained the same job title and level of pay. (Defs.'s Reply at 15.) In the context of Title VII retaliation

---

[14]See footnote eight supra.

claims, however, the Ninth Circuit has held that an "adverse employment action" is an activity that is "likely to deter employees from engaging in protected activity" and thus includes actions such as lateral transfers. Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000). Accordingly, this Court finds that the asserted reassignment to the motor shop constitutes an adverse action.

Having found the first two elements satisfied, the Court will now address whether there is a sufficient causal connection between Plaintiff's comments at the April 27 meeting and each alleged instance of retaliation.

First, the temporal proximity between the April 27 meeting and Plaintiff's asserted removal as mill lead electrician one week following that meeting is sufficient to satisfy Plaintiff's prima facie showing of causation. However, it appears that HC&S has satisfied its burden of negating any causal connection between Plaintiff's April 27 comments and his removal as mill lead electrician. Specifically, HC&S asserts that it is "common practice" for the company to give Level B electricians like Plaintiff the responsibilities of a lead electrician in order to determine if they can perform the job successfully. (Luuwai Reply. Decl. ¶ 3.) According to HC&S, if the electrician performs well, he will be eventually placed in a permanent lead electrician position. (Id.) HC&S submits two documents suggesting

that Plaintiff was not able to perform an essential function of the lead electrician position: (1) a "Performance Evaluation," completed by Plaintiff's supervisors on April 11, 2011 (before the April 27, 2011 meeting), indicating that Plaintiff had deficiencies in trouble shooting skills; and (2) the notes of Supervisor Rudy Labuguen, which also indicate that Plaintiff had difficulties with trouble shooting. (Defs.'s Reply Exs. 1-2.) Accordingly, it appears that HC&S had a reasonable, good-faith basis for "removing" Plaintiff from his mill lead electrician position.

Second, it appears that there is not a causal link between Plaintiff's comments at the April 27 meeting and the asserted slapping incident on June 8, 2011. Specifically, Plaintiff does not argue that Acpal slapped him because of his comments at the April 27 meeting; rather, Plaintiff states in his declaration that Acpal slapped him as a "joke." (Pl.'s Decl. ¶ 14.) Further, Plaintiff stated during his interview with Loomis that Acpal had slapped or punched him numerous times during the daily morning electricians' meetings and that this "has gone on since March 2008." (Defs.'s CSF Ex. 5 at DD 00217.) Plaintiff also stated during his interview with Loomis that Acpal had punched other employees as well. (Id.) Accordingly, it appears that there is not a causal connection between the June 8 slapping incident and Plaintiff's comments at the April 27 meeting.

Third, even assuming Plaintiff can establish a prima facie case of causation, as discussed in detail directly above, HC&S produces evidence that the company had a legitimate basis for not promoting Plaintiff to a "Level A" Lead Electrician position,[15/] specifically, that Plaintiff had difficulties with "trouble shooting." (See Defs.'s Reply Ex. 1 (April 12, 2011 Performance Evaluation) & Ex. 2 (notes from supervisor Labuguen).) Accordingly, it appears that there is not a causal connection between the alleged failure to promote Plaintiff to "Level A" and his comments at the April 27 meeting.

Finally, the temporal proximity between Plaintiff's comments at the April 27 meeting and HC&S's decision on June 8, 2011, to reassign him to the motor shop is sufficient to satisfy Plaintiff's prima facie showing of causation. However, it appears that HC&S has met its burden of showing that the transfer to the motor shop would have occurred regardless of the protected activity. Specifically, HC&S submits that the company typically rotates electricians among the four areas of the facility, including the motor shop. (Luuwai Reply Decl. ¶ 8.) Moreover, HC&S further submits that Plaintiff was transferred to the motor shop in June 2011 because the "factory/mill work" he had been doing required troubleshooting, a skill Plaintiff had

_____

[15/]Although the parties use different terminology, it appears that "mill lead electrician" is synonymous with "Level A Lead Electrician."

difficulties with. (Id. ¶ 9.) Plaintiff has not put forward any
evidence, as required by Rule 56(e), disputing HC&S's evidence or
otherwise indicating that HC&S's decision did not have a
legitimate basis for transferring him to the motor shop.

In sum, all of Plaintiff's HWPA claims premised on his
comments at the April 27 meeting fail on the merits. In any
event, this Court lacks jurisdiction to hear any of these claims
(except his claim regarding the alleged slapping and punching
incidents) because they are preempted by Garmon. See Part I.B. of
this Order, supra pages 29-30. Accordingly, the Court grants
Defendants' motion for summary judgment as to the HWPA claims
based on Plaintiff's comments at the April 27, 2011 meeting.

## C. HWPA Claims Based on Reports Regarding the Broken Grounding Clip

As noted above, on October 26, 2011, Plaintiff reported
to Pacubas that a grounding clip in the motor shop was broken,
unsafe to use, and thus needed to be replaced. (Pl.'s CSF Ex.
24.) During the November 3, 2011 electrical department meeting
and in the presence of Pacubas, Plaintiff told Skrobecki that
Pacubas did not address his safety concerns about the broken
grounding clip. (Id.) Plaintiff asserts that, in response to his
October 26 report regarding the broken grounding clip, Pacubas
issued Plaintiff a verbal warning in late October 2011 regarding
the alleged improper installation of a motor bearing. (Pl.'s Opp.
at 14.) Plaintiff further asserts that, in response to his

comments at the November 3 meeting, Pacubas issued Plaintiff an

Employee Discipline Notice accompanied by a $310 fine for

altering his work coveralls. (<u>Id.</u>) Although these claims are

preempted by <u>Garmon</u>, <u>see</u> Part I.C. of this Order, <u>supra</u> pages 30-

31, the Court will nevertheless analyze the merits of these

claims.

There is no dispute that Plaintiff's report that the

broken grounding clip was unsafe constitutes protected activity.

Nor is there a dispute that the October 2011 verbal warning or

Employee Discipline Notice was an adverse action. Thus, the only

remaining issue is whether these adverse actions would have been

taken "regardless of the protected activity." <u>Griffin</u>, 654

F.Supp.2d at 1132.

As to Plaintiff's claim that he was retaliated against

when Pacubas issued him a verbal warning for the alleged improper

installation of the motor bearing[16/], HC&S submits evidence that

Pacubas discovered the motor bearing was improperly installed by

Plaintiff when workers put a load on the thrust bearing and the

motor failed. (Pacubas Decl. ¶ 7.) HC&S further submits that two

millwrights from the machine shop, Freddie Yanos and Sheldon

Biga, confirmed that the bearing had been installed upside down.

---

[16/]The record does not indicate the specific date that
Pacubas issued the verbal warning. However, it appears that it
was issued on October 26, 2011, or very shortly thereafter. (<u>See</u>
Pacubas Decl. ¶ 7.)

(Id.) Plaintiff does not produce any evidence, as required by Rule 56(e), controverting HC&S's evidence or otherwise indicating that Pacubas did not have a reasonable or good-faith basis for his decision to issue Plaintiff the verbal warning.

With respect to Plaintiff's claim that he was retaliated against when Pacubas issued him the Employee Discipline Notice,[17/] Plaintiff admits that he attended a training session where the electricians were told that their company-issued work coveralls were for protective safety purposes. (Defs.'s CSF Ex. 4; Pl.'s CSF ¶ 24.) Plaintiff knew or should have known that he was violating company safety rules by cutting the sleeves off his coveralls. Thus, Pacubas' issuance of the Employee Discipline Notice was proper and would have occurred regardless of any protected activity. See Griffin, 654 F. Supp.2d at 1131-32.

In sum, because the causal connection requirement has not been satisfied as to either claim, the Court finds that Plaintiff's HWPA claims based on his reports regarding the broken grounding clip fail on the merits. Alternatively, this Court lacks jurisdiction to hear these claims because they are preempted by Garmon. See Part I.C. of this Order, supra pages 30-31. Accordingly, the Court grants Defendants' motion for summary

---

[17/]The record does not indicate the specific date that Pacubas issued the Employee Discipline Notice. (See Defs.'s CSF Ex. 29.)

judgment as to the HWPA claims premised on Plaintiff's reports regarding the broken grounding clip.

**CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to all of the claims in Plaintiff's FAC against Defendants HC&S and Pacubas.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, August 29, 2014.



Alan C. Kay
Senior United States District Judge

Casumpang v. Hawaiian Commercial and Sugar Company et al., Civ. No. 12-00694
ACK-BMK: Order Granting Defendants' Motion for Summary Judgment